UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHN ALFREY,                :
                               :   NO. 1:04-CV-00151
        Plaintiff,        :
                               :   **OPINION AND ORDER**
                               :
   v.                       :
                               :
                               :
AK STEEL,               :
                               :
        Defendant.       :

        This matter is before the Court on the Defendant AK Steel's (hereinafter "AK") Motion for Summary Judgment (doc. 22), the Plaintiff John Alfrey's (hereinafter "Alfrey") Memorandum in Opposition to AK's Motion for Summary Judgment (doc. 25), and AK's Reply to Alfrey's Memorandum in Opposition (doc. 28). Alfrey alleges that AK violated his federal rights by firing him because of his age. AK maintains that no genuine issues of material fact exist in this matter and that, pursuant to Rule 56 of the Federal Rules of Civil Procedure, it is entitled to summary judgment.

**FACTS**

        The following facts are taken from AK's Motion for Summary Judgment (doc. 22) and from Alfrey's Memorandum in Opposition where disputed or supplemented (doc. 25). AK manufactures flat-rolled steel at its plant in Middletown, Ohio (doc. 22). AK maintains that its number one priority is safety and that it is the safest steel company in North America (Id.). AK's

focus on safety and commitment to safety is managed by a three-pronged program (Id.). This program emphasizes total management commitment, employee education and awareness, and employee accountability (Id.). The Chairman of the Board for AK is supposedly notified of any safety violation occurring on AK property within twenty-four hours of the violation (Id.). AK claims that accident investigation is an integral part of its safety program and that it thoroughly investigates the causes of every accident or near miss accident to ensure that the same problem does not occur in the future (Id.).

AK employees are made aware of the safety plan (Id.). Every employee must attend an eight-hour safety awareness class and an additional department-specific safety orientation program (Id.). Each employee of AK receives a copy of AK's Safety and Health Rules and Instructions booklet containing all of the plant-wide safety rules (Id.). AK conducts daily safety meetings at the start of each employee's shift (Id.). Furthermore, AK conducts weekly 20-30 minute departmental safety meetings for every employee of a given department (Id.). Additionally, management and hourly safety coordinators conduct a number of safety observations of employees every week (Id.). AK asserts that it strictly enforces its safety rules and that employees are made aware that they will be held accountable if they violate the rules (Id.).

AK avers that safety is of extreme importance in the

-2-

Truck Section where employees operate huge trucks with payloads weighing up to 240,000 pounds (Id.).  Any accident involving these trucks represents a serious safety violation in the eyes of AK, one that must immediately be investigated (Id.).  AK Safety Rule 27.1 requires that all accidents and near-miss accidents be reported immediately to management (Id.).  The rule mandates that management is to investigate every accident/near-miss "to determine what caused the accident/incident/exposure and prevent a recurrence that could cause serious injury . . ." (Id.).  If a truck driver is involved in an accident/near-miss that truck driver may report the accident to the Truck Master (the position which Alfrey held at AK) (Id.).  It is then the responsibility of the Truck Master to report the accident to a Shift Manager or Safety Coordinator (Id.).

This requirement that a Truck Master notify a Shift Manager or Safety Coordinator about an accident is extremely important, maintains AK, because management must be able to immediately investigate the root cause of every accident/near-miss in order to take corrective measures (Id.).  Corrective measures might include: repair of faulty equipment; additional training for employees; discipline of employees; drug testing of employees involved in the accident; as well as other mesaures. (Id.).  Failure to report an accident results in AK's inability to conduct a prompt and complete investigation to determine the cause of the accident and take corrective measures (Id.).  As such, AK seeks to

-3-

strictly enforce the rule requiring immediate reporting of accidents/near-misses (Id.).

At the time of Alfrey's termination he was employed by AK as a Truck Master in the Truck Section of AK's Transportation Department (Id.). He held this position for two years prior to his termination in January 2003 (Id.). A Truck Master is a crew chief responsible for directing the activities of a crew of truck drivers (Id.). A Truck Master is not a supervisory position (Id.). However, it is viewed as a leadership position among the hourly employees (Id.). The Truck Master provides support for the Accident Prevention Fundamentals Program at AK (Id.). The Truck Master conducts safety meetings with his crew and is responsible for making safety contacts and observations of employees during the shift to ensure compliance with the safety rules of the Truck Section (Id.). AK avers that Alfrey was imminently familiar with the requirement that he report any accidents/near-misses immediately to management (Id.).

On December 22, 2002, during the 3:00 to 11:00 P.M. shift, Gary Nickell (hereinafter "Nickell"), a truck driver for AK, caused an accident whereupon he ran the truck he was driving into a concrete structure resulting in a six-inch dent in the truck's rear bumper (Id.). Before Nickell's shift ended on December 22, 2002, he informed Alfrey of the accident and showed Alfrey the damage to his truck (Id.). Alfrey testifies in his deposition that

-4-

he did not notify a Safety Coordinator or Shift Manager of the accident because he did not want Nickell to be disciplined for the accident (Id.). Presumably Alfrey did not want to report the accident as he knew that Nickell had recently been disciplined for another accident (Id.). Manager Mick Paddock (hereinafter "Paddock") learned of the accident the next day, after a truck driver on a subsequent shift spotted the damage and reported it (Id.). Paddock confronted Alfrey and Alfrey admitted he knew about the accident, but had failed to report it (Id.).

AK held a disciplinary meeting with Alfrey and his union representative in which Alfrey initially alleged he failed to report the accident because he thought the accident was not serious enough to be reported (Id.). At the hearing, Alfrey ultimately acknowledged that he was aware of Nickell's previous accident and that he did not report the accident so as to prevent further disciplinary action against Nickell (Id.). Paddock considered Alfrey's excuse for not reporting the accident - namely, that the accident was not serious enough - as simply a pretext for the true reason for not reporting - that being an attempt to keep Nickell from being disciplined (Id.). This, in Paddock's opinion, was a dischargeable offense in violation of AK Safety Rule 27.1 (Id.).

Prior to this incident, Alfrey had been disciplined for other reasons (Id.). For instance, on November 12, 2002, Alfrey was issued a one-day suspension for failure to wear any of

-5-

his required protective equipment in the plant during midnight shift (Id.).  Alfrey was reportedly unhappy about the suspension and he wanted to know who had informed management of the violation (Id.).  According to Alfrey's deposition testimony, he became vindictive and demonstrated a poor attitude toward the Shift Manager who had disciplined him (Id.).  Alfrey would only respond with "yes" or "no" answers when his Shift Manager would speak to him (Id.).  Alfrey played the song, "Take This Job and Shove It," over and over again for a period of time from his office so that other employees could hear the song (Id.).  Employees began to complain that Alfrey was not being cooperative as their crew chief and that he was not answering his radio, refusing to be a team leader, and was failing to conduct proper safety contacts to inform the crew of recently issued safety information (Id.).

Alfrey's Shift Manager Rick Smith (hereinafter "Smith") and his Section Manager Dave Malott (hereinafter "Malott") held a meeting to discuss Alfrey's attitude, the complaints levied against Alfrey by other employees, and Alfrey's supposed disrespect for safety rules (Id.).  Alfrey was also at this meeting (Id.).  Smith and Malott reminded Alfrey that safety was priority number one at AK (Id.).  Alfrey was put on notice to correct his behavior (Id.).  He was told that a failure to do so would result in consequences (Id.).  Alfrey promised Smith and Malott that he would change his ways and apologize to the other employees (Id.).

-6-

However, Smith and Malott contend that he did not amend his behavior or change his attitude as promised (Id.). Ultimately, after the incident of December 22, 2002 and taking into account these previous problems, Paddock concluded that Alfrey's attempted cover-up of the accident in violation of Safety Rule 27.1 warranted discharge (Id.).

Alfrey subsequently appealed his discharge pursuant to the collective bargaining agreement ("CBA") (Id.). Alfrey admitted at his appeal that he did not do the right thing (Id.). Furthermore, Alfrey admitted in deposition a number of things that AK highlights in its Motion (Id.). These include:

- Alfrey, as a Truck Master, was responsible for providing support of the accident prevention fundamentals program of AK and he was compensated for his leadership responsibilities.
- Alfrey was required to know and follow all of the safety rules.
- Alfrey was aware of AK's focus on safety and that violation of safety rules was taken seriously by AK.
- Alfrey was required to hold daily "toolbox" safety meetings and longer weekly safety meetings with his crew.
- Alfrey was well aware of the rule that all accidents/near-misses were to be immediately reported to supervision. This requirement was reiterated by AK management at several safety meetings in the months preceding the incident involved in this litigation. Alfrey attending these meetings.
- Alfrey violated a written safety rule by not reporting the accident on December 22, 2002. Alfrey admits that there were no exigent circumstances which prevented him from reporting the accident.
- Alfrey acknowledges that it was wrong of him to not follow the proper procedure and that he did so only to shield Nickell from further discipline.
- Alfrey appealed his discharge internally and took his appeal to arbitration. At none of these appeals/arbitration did Alfrey complain of age

-7-

discrimination. At Alfrey's arbitration, the arbitrator determined that Alfrey's failure to report the accident was an offense that warranted discharge. Ultimately the arbitrator found AK's termination of Alfrey was just.

(<u>Id</u>.).

AK avers Paddock had no knowledge of who would ultimately fill Alfrey's position when the decision was made to CBA governing hourly employment at AK, permanent vacancies are filled according to strict seniority-based promotions (<u>Id</u>.). A position is filled by the employee with the highest seniority in the line of progression to the vacant position (<u>Id</u>.). That individual may choose to accept or decline the advancement (<u>Id</u>.). If that individual declines, the position is offered to the employee with the next-highest seniority level (<u>Id</u>.). Paddock presumably had no knowledge of who was next in line for the position and whether that individual would accept or decline the promotional opportunity (<u>Id</u>.).

Alfrey notes that he was a thirty-year employee of AK and was 55 years old when he was terminated (doc. 25). He claims that his termination resulted from AK's unwillingness to cut him a break (<u>Id</u>.). Furthermore, Alfrey argues that AK follows a progressive discipline policy which includes oral or written warnings in addition to suspension and discharge (<u>Id</u>.). Alfrey avers that AK had a practice of considering mitigating factors, <u>e.g.,</u> length of service, knowledge of the job, an employee's personal difficulties, the employee's training, and the severity of

-8-

the infraction, before imposing discipline (Id.).

Alfrey details his employment progression at AK, starting in 1972 as Labor Reserve and progressing in 2001 to the position he held at the time of his termination, Truck Master (Id.). Alfrey notes that he had good attendance, knew his job, and performed that job adequately (Id.). Alfrey contends that even supervisors outside of his department recognized his value to AK (Id.). Alfrey maintains that he was a valuable employee and without dispute was qualified for the position of Truck Master (Id.).

Alfrey notes that the accident on December 22, 2002 was not reported to him by Nickell until the end of his shift (Id.). The accident was characterized by Ronald Riley, Safety Coordinator, as "minor" (Id.). Alfrey claims he intended to report the accident the following morning since the accident was only minor in scope (Id.). However, Alfrey contends that he did not have a chance to report the accident the next morning because he was immediately confronted by Paddock regarding the accident (Id.). Alfrey's suspension pending termination followed shortly afterthis confrontation (Id.). Then on January 6, 2003, Alfrey received a letter notifying him of his termination (Id.).

Alfrey maintains that AK overlooked safety concerns about younger employees in positions of equal or greater responsibility than Alfrey's position (Id.). As examples of this

-9-

type of behavior, Alfrey highlights Paddock (Id.). In 1999 Paddock "failed to demand accountability of subordinates and failed to meet the safety standards of this department" (Id.). Paddock was not suspended or terminated as a result of this behavior (Id.). Paddock was age forty at the time (Id.). Another example highlighted by Alfrey involved Doug Jones (hereinafter "Jones"), Shift Manager in the Transportation/Railroad division (Id.). Jones, born in 1955, was reviewed by Paddock in March 2001 (Id.). That review stated Jones had a "reluctance to hold his people accountable when following safety rules" (Id.). Jones was reassigned instead of suspended or terminated (Id.).

Alfrey points to Matt Dunn (hereinafter "Dunn") as another example of a younger employee handled differently for safety violations than older employees (Id.). Dunn, born in 1973, dropped a heavy block on a fellow employee from the crane he was operating, resulting in the fellow employee's death (Id.). Dunn was not terminated despite the determination that a safety violation had occurred (Id.). AK acknowledges that its policies call for automatic termination where accidents cause fatalities (Id.). Another employee, Duane Rush (hereinafter "Rush"), age thirty six, was suspended but not terminated for "violating safety rules - and causing a potentially fatal, accident" (Id.). Rush backed the truck he was driving into a forklift with enough force to bend the door of the forklift (Id.). It was determined that had

-10-

the forklift been occupied at the time of the accident serious injury or death would have resulted (Id.).  Again, in 2003, Rush misloaded a truck he was driving, causing it to jack knife when he started moving (Id.).   Rush was only warned concerning this incident (Id.).  The supervisor issuing the warning, noted at the time that Rush's attention seemed to be not on safety but on the bonus he would get for performing his work quickly (Id.).   The seriousness of the accidents involving Dunn and Rush are more severe than the incident at issue in this matter, claims Alfrey (Id.).

Also highlighted by Alfrey is Dickie Brandon (hereinafter "Brandon") (Id.).  Brandon, age forty four, allegedly took part in a feud with another employee, Tim Keith (hereinafter "Keith"), which Malott identified as a safety concern (Id.).   The feud between these two individuals resulted in what Alfrey classifies as "road rage" (Id.).   Malott only conducted a counseling session in response to this behavior - Brandon was not suspended or terminated for his behavior (Id.).  Additionally, in 1995, Brandon challenged a co-worker to a fight in the company parking lot after an argument about a phone call he received at work from an ex-girlfriend (Id.).  Again, Brandon was not suspended or terminated for this behavior (Id.).

Lastly, Alfrey discusses Dennis Mason (hereinafter "Mason"), age thirty, who in April 2004 was suspended for one day

for violating Safety Rule 1.10 when he engaged in "horseplay" with another employee (Id.). Also, in 2002, Mason struck a post with his trailer hauling coils (Id.). The accident caused damage to the trailer (Id.). Mason received only a formal warning for being inattentive to his surroundings (Id.).

**APPLICABLE LEGAL STANDARD**

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. Id. at 321; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for

-12-

trial." Fed. R. Civ. P. 56(e); see <u>Guarino</u>, 980 F.2d at 405.

As the Supreme Court stated in <u>Celotex</u>, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324; <u>Guarino</u>, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.'" <u>Guarino</u>, 980 F.2d at 405 (quoting <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

**ANALYSIS**

As direct evidence of an employer's discrimination is rarely available, courts rely on the well-established <u>McDonnell</u>

-13-

Douglas-Burdine analysis.  See e.g., Kline v. Tennessee Valley Authority, 128 F.3d 337, 348 (6th Cir. 1997).  McDonnell Douglas - Burdine permits a plaintiff to prove their case of discrimination through circumstantial evidence.  Id.  When no direct evidence of discrimination is available and a plaintiff avails himself of the McDonnell Douglas - Burdine burden-shifting approach, the plaintiff must, through "inferential and circumstantial" evidence, prove [his] prima facie case . . . [so as to] support an inference of discrimination.  Kline at 348.

        To establish the prima facie case via "inferential and circumstantial" evidence proving an "inference of discrimination," a plaintiff must meet certain requirements.  These requirements are: (1) proof he is a member of a protected class; (2) proof he was subject to an adverse employment action; (3) proof he was qualified for the position; and (4) proof he was replaced by a person outside the protected class.  Grosjean v. First Energy Corp., 349 F.3d 332 (6th Cir. 2003) citing Kline at 349.  Alfrey, in the instant action, claims he was both replaced by a person outside his protected class and that he was treated less favorably than similarly situated employees outside his protected class.  When claiming the latter, the fourth requirement of the McDonnell Douglas - Burdine analysis is replaced by the requirement that a plaintiff prove he was treated less favorably than similarly situated employees outside his protected class so as to support an

-14-

inference of discrimination.  See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 351 (6th Cir. 1998).  The Court does not find Plaintiff has produced direct evidence of discrimination and, therefore, Plaintiff must resort to the McDonnell Douglas - Burdine analysis to prove his claims.

Once a plaintiff has established a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Kline at 342.  If a defendant can meet this burden, the plaintiff must then prove that the articulated legitimate, nondiscriminatory reasons proffered by defendant were pretextual.  Kline at 342. "Pretext is established by a direct showing that a discriminatory reason more like motivated the employer or by an indirect showing that the employer's explanation is not credible."  Id. at 343 citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Pretext can be established by showing (1) that the defendant's proffered reasons had no basis in fact (i.e., they actually did not occur; (2) that the proffered reasons did not actually motivate the plaintiff's discharge; and (3) that the proffered reasons were insufficient to motivate plaintiff's discharge.  Kline at 346 citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994).  The Sixth

-15-

Circuit in _Manzer_ cited the Seventh Circuit case, _McNabola v. Chicago Transit Auth._, 10 F.3d 501 (7th Cir. 1993), in establishing these three modes of proving pretext. _Manzer_ at 1084. _Manzer_ discusses the route one must take in establishing each mode. _Id_. It is the second mode that Alfrey primarily relies upon in the instant case to establish pretext.

> The second mode (_i.e.,_ that the proffered reasons did not actually motivate the plaintiff's discharge), involves the plaintiff admitt[ing] the factual basis underlying the employer's proffered explanation and further admit . . .[ing] that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was _more_ likely than that offered by defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of the discrimination makes it 'more likely than not' that the employer's explanation is pretext, or a coverup.

_Manzer_ at 1084 (_internal citations omitted_).

AK argues that Alfrey cannot establish a _prima facie_ case of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 _et. seq._ (doc. 22). AK asserts that Paddock did not know who was next in line in seniority and did not know who would accept or decline the opportunity to be promoted to Alfrey's vacant position (_Id_.). Thus, argues AK, even if the person who replaced Alfrey was substantially younger, Alfrey cannot make a _prima facie_ showing of age discrimination because Paddock had no knowledge of or control over who would be Alfrey's

-16-

replacement (Id. citing Milnaric v. Parker Hannifin Corp., 853 F.2d 927 (6th Cir. 1988) (holding that the district court properly directed a verdict in favor of the defendant employer, in part because there was no prima facie case of age discrimination where the plaintiff was replaced by a twenty-nine-year-old employee, "not by defendant's choosing, but by operation of the CBA").  So, concludes AK, since Alfrey has no direct evidence of age discrimination and does not have a prima facie case creating an inference of age discrimination, his ADEA claim must be dismissed (Id.).

Alfrey counters arguing that he can establish a prima facie case of age discrimination (doc. 25).  It is not disputed that Alfrey was over forty-years-old, thus meeting the first element of his prima facie case.  Nor is it disputed that he was qualified for the position of Truck Master.  Likewise, his termination is clearly an adverse employment action.  It is, as noted above, the fourth element which AK claims Alfrey has failed to establish (doc. 22).  Alfrey asserts he can meet the fourth requirement either by showing (1) that he was replaced by a substantially younger employee or (2) that he was treated differently than similarly situated younger employees or (3) that additional direct or circumstantial evidence exists that shows AK was motivated by his age in terminating him (doc. 25 citing O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308 (1996); Texas

Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir. 1998); Ohio Civil Rights Comm'n v. Ingram, 69 Ohio St. 3d 89, 92 (1994)).

First, Alfrey asserts that he was replaced by a younger individual and that AK's contention that he was not is both factually and legally incorrect (doc. 25). Tim Hocz (hereinafter "Hocz") replaced Alfrey (Id.). Hocz was nine years younger than Alfrey (Id.). Alfrey contends that AK's reliance on Paddock's lack of knowledge as to who would replace Alfrey (due to the CBA) is misplaced (Id.). The CBA, argues Alfrey, does not define seniority only through length of service (Id.). The CBA defines seniority to include length of service to the company, knowledge, skill, physical fitness, and job efficiency (Id.). As such, Alfrey argues that someone at AK is responsible for weighing these factors when determining replacements (Id.).

In response to AK's reliance on Mlinaric, Alfrey cites Laughlin v. United Tel.-Southeast, Inc. No 96-5295, 1997 U.S. App. LEXIS 3822 (Feb. 27, 1999 6th Cir.), a decision rendered post-Mlinaric. Alfrey maintains that Laughlin establishes that indeed a prima facie case of age discrimination can be met, despite the presence of a CBA, where the plaintiff was replaced by a younger employee even where the employer did not know who the replacement

would be.  Id. at *7.  Laughlin viewed the requirements of the CBA more as a factor to consider when evaluating the employer's legitimate, nondiscriminatory reason for the plaintiff's termination and not as a factor either supportive or non-supportive of plaintiff's prima facie case.  Laughlin at *7-8.

The Court declines to take a position on whether the CBA works in Alfrey's favor or against him.  Rather, the Court finds that Alfrey has established his prima facie case by showing that he was treated differently than similarly situated, younger employees. Now, the Court must turn to the legitimate, nondiscriminatory reason proffered by AK and whether that reason is merely pretext.

AK asserts that if Alfrey establishes a prima facie case of age discrimination, this matter should still be dismissed as Alfrey can not prove pretext (doc. 22).  AK notes that Alfrey admits he was terminated for failing to report an accident, in violation of Safety Rule 27.1 (Id.).  Furthermore, Alfrey admits that it was wrong of him to not report the accident and that he did not set a good example as crew chief (Id.).  In light of Alfrey's other safety violations and warnings, AK asserts that discharge was determined to be the appropriate action (Id.).  Thus, as a legitimate, nondiscriminatory reason has been proffered by AK, the burden now shifts to Alfrey to demonstrate that this reason is merely pretext.  In anticipation of Alfrey's insistence that pretext exists, AK provides the following counter-arguments.

-19-

First, AK argues that Alfrey does not even believe that he was subjected to discrimination based upon his age (Id.). Rather, AK maintains that Alfrey believes that Smith discriminated against him because he had made Smith look bad at a meeting (Id.). When asked if he thought any other manager discriminated against him, Alfrey responded "no" (Id.). As such, AK maintains that Alfrey does not actually believe Paddock discriminated against him for any reason (age or otherwise) (Id.).

Additionally, AK avers that Alfrey can not demonstrate pretext by showing that "comparable" employees were treated differently (Id.). AK makes this averment based upon its belief that no other similarly situated employees exist (Id.). To be deemed "similarly situated" a plaintiff must establish that all relevant aspects of his employment situation were nearly identical to those he claims are similarly situated. Ercegovich v. Good Year Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1992). Furthermore, Ercegovich notes that to be deemed similarly situated

> [T]he individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

Id. at 352 quoting Mitchell v. Toledo Hosp., 964 F.2d 577 (1992). According to AK, Alfrey, during deposition, could not identify a single similarly situated employee who was allegedly treated

-20-

differently (doc. 22). Those employees which Alfrey does put forth as similarly situated, claims AK, were not in the same leadership position as Alfrey, were not engaged in the same conduct, nor did they deal with the same supervisor (Id.).

AK highlights that Rush did not deliberately violate a safety rule as did Alfrey (Id.). Rush merely backed a truck into a forklift - he did not purposely fail to report an accident as did Alfrey. Additionally, Rush was not in the same leadership position as Alfrey. Consequently, AK argues that Rush "certainly did not 'engage in the same conduct without such differentiating or mitigating circumstances that would distinguish [his] conduct or the employer's treatment of [him] for it" (Id.). As to Alfrey's claim that Nickell was similarly situated, AK notes that Nickell did in fact comply with AK safety procedures by notifying the Truck Master concerning the accident who then in turn reported the accident to the Safety Coordinator (Id.). Again, AK contrasts Nickell's compliance with Alfrey's deliberate avoidance of said requirement (Id.). This, argues AK, renders Alfrey's attempted comparison with Nickell ineffective (Id.). Alfrey also alleges that three other Truck Masters failed to report accidents, but management never learned of these "unreported" accidents (Id.). Accordingly, AK contends that these other Truck Masters who are allegedly "rumored" to have covered up accidents can not be similarly situated to Alfrey if management had no knowledge upon

which to take action (Id.).

Alfrey argues that the "similarly situated" standard is not an "exceedingly narrow" one (doc. 25 citing Ercegovich at 344). It is not a requirement that the plaintiff and comparators hold identical jobs. Id. at 353. Alfrey contends that the comparators, Dunn, Rush, Brandon, Mason, Jones, and Paddock are all similarly situated (Id.). Alfrey provides a chart in his Memorandum in Opposition detailing his comparators, the department they worked in, their age, the safety violation they allegedly violated, and the resulting discipline for the violation (Id.).

Although the Court agrees that the "similarly situated" requirement is not a narrow determination, the Court does not find these comparators similar enough. None of the comparators' position is identical to Alfrey. However, more importantly is the "type" of safety violation Alfrey committed. Alfrey chose not to report an accident as required by Safety Rule 27.1. The comparators all appear to have overtly violated a safety rule in contrast to Alfrey's subversive violation.

Alfrey cites Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133 (2000), for the proposition that a plaintiff can prove pretext by establishing a prima facie case combined with evidence raising issues of fact regarding the defendant's credibility - needing no additional evidence of discrimination (doc. 25 citing Reeves at 149). Alfrey points to AK's change in

-22-

its articulated reason for his termination as evidence of pretext (Id.). Paddock testified before the arbitrator that Alfrey's safety record and the counseling he received shortly before his termination factored in his decision to suspend Alfrey pending termination (Id.). However, argues Alfrey, these assertions are contrary to Paddock's deposition testimony in which he indicated he did not take these items into consideration when suspending Alfrey subject to termination. In support of this argument, Alfrey cites White v. Burlington N. Santa Fe Ry. Co., 364 F.3d 789 (6th Cir. 2004) (en banc).

AK asserts that Alfrey has provided an incomplete representation of Paddock's arbitration testimony and a mischaracterization of Paddock's deposition testimony (doc. 28). The Court agrees with AK that the record indicates Paddock always considered the violation of Safety Rule 27.1 as a dischargeable offense. Paddock's testimony revolving around Alfrey's previous discipline clearly was considered only for mitigation purposes. Paddock's testimony that violating Rule 27.1 was the reason for firing Alfrey is consistent with the conclusion drawn by the arbitrator in this matter.

Likewise, Alfrey argues pretext can be shown, as discussed above, through AK's favorable treatment to other similarly situated but substantially younger employees. Ercegovich, although emphasizing that a narrow construction of

-23-

"similarly situated" was inappropriate, did specifically identify the factors of same supervisor, same standards, and same conduct as "relevant considerations in cases alleging differential disciplinary action." Ercegovich at 352; Tartt v. City of Clarksville, 2005 WL 2210224 (6th Cir. Sep. 13, 2005). In Hardy v. Eastman Chem. Co., 50 Fed. Appx. 739, 2002 WL 31553926 (6th Cir. Nov. 12, 2002), the court held that although both employees wrongfully obtained and studied test answers before the exam, the fact that only the plaintiff took the answers into the exam room with him was sufficient to warrant the disparity in treatment. Id. at 743. Similarly, in Gray v. Toshiba Am. Consumer Prods., Inc., 263 F.3d 595 (6th Cir. 2001), the court found that the plaintiff's planned assault on a coworker was sufficiently different from other employee's spontaneous fist fighting to warrant more severe punishment. Id. at 601.

Furthermore, courts within the Sixth Circuit have found that differences in status within a company can justify disparity in treatment. See e.g., Macklin v. Turner, 2005 WL 2211170 (N.D. Ohio Sep. 9, 2005) ("Employees held to different standards are not similarly situated."); Quinn-Hunt v. Bennett Enters., 2005 WL 2174053 (N.D. Ohio, Sep. 7, 2005) ("Supervisory and non-supervisory employees are not similarly situated, and an employer may therefore justifiably treat such employees differently."); Palmer v. Potter, 97 Fed. Appx. 522, 525 (6th Cir.

-24-

2004) ("An employer is justified in disciplining offenders such as Palmer - veterans who hold elevated positions - more harshly than their junior colleagues."). Although Alfrey cites to Paddock, Malott, and Smith's deposition testimony wherein all three stated "the safety rules of AK Steel apply across the board," "everybody is supposed to follow the general safety standards to some degree," and "everybody would be required to use [a safety] handrail" does not mean, asserts AK, that it does not take into account the particular circumstances of an employee's position (doc. 28). In fact, notes AK, the CBA states, "[t]he extent of such disciplinary suspensions shall be determined in each particular case, as circumstances may warrant" (Id.).

Additionally, AK argues that the Sixth Circuit has acknowledged an important distinction between conduct that is accidental/careless and conduct that is deceptive and subversive. See e.g., Espitia v. P&G, 93 Fed. Appx. 707, 710-11 (6th Cir. Mar. 1, 2004). In Espitia the plaintiff was terminated after having violated a strict timekeeping policy by failing to indicate a three-hour-long absence during the middle of the day on his time sheet. Id. The court found employees who did not mark their tardiness upon arrival to work something different than the plaintiff's action. Id. ("Not reporting tardiness indicates carelessness, while not reporting a three-hour mid-day absence indicates something worse."). The Court agrees that Alfrey's intentional

-25-

decision not to report the accident is something altogether different than the safety violations committed by the comparators.

**CONCLUSION**

Accordingly, the Court finds that Alfrey has established a <u>prima facie</u> case of age discrimination. Having done so, AK must present a legitimate, nondiscriminatory reason for terminating Alfrey. AK has proffered Alfrey's intentional violation of Safety Rule 27.1 coupled with his previous safety violations as its reason for terminating Alfrey. As such, the burden shifts to Alfrey to prove that this legitimate, nondiscriminatory reason put forth by AK is merely pretext. Alfrey has failed to do so. He has not established that AK's proffered reason has no basis in fact. Nor has he established that a genuine issue of material facts exists to show that AK's reason did not actually motivate Alfrey's discharge or that the reason was insufficient to motivate discharge. Alfrey's conduct is significantly distinct from the conduct of the comparators to render him not similarly situated. Deliberately failing to report an accident was deemed a serious offense by AK - especially, where Alfrey held a position of some supervisory capacity requiring him to report any accident/near miss to a Safety Coordinator or other supervisor. Having failed to establish pretext, Alfrey's claim is not well-taken.

AK's Motion for Summary Judgment is hereby GRANTED (doc.

22). This matter is DISMISSED.

       SO ORDERED.


Dated: November 8, 2005     <u>/s/ S. Arthur Spiegel            </u>

                                           S. Arthur Spiegel
                                           United States Senior District Judge